JOHN S. STEWART, OSB No. 711648
jstewart@lawssg.com
STEWART, SOKOL & GRAY, LLC
2300 Southwest First Avenue, Suite 200
Portland, OR 97201
Telephone:    (503) 221-0699
Facsimile:    (503) 419-0281

NANCY L. ISSERLIS, *pro hac vice*
nli@winstoncashatt.com
WINSTON & CASHATT
601 West Riverside, Suite 1900
Spokane, WA  99201
Telephone:    (509) 838-6131
Facsimile:    (509) 838-1416

Attorneys for the Management Committee

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON (Eugene)

| | |
|---|---|
| In re:<br><br>**STAYTON SW ASSISTED LIVING, LLC,**<br>(Constituting the Sunwest Unitary Enterprise as determined by the Order entered in U.S. District Court Case No. 09-cv-6056-HO)<br><br>Debtor. | No. 09-cv-06082-HO<br><br>Bankruptcy Court Case No. 08-36637-tmb11 (Reference Withdrawn)<br><br>**MOTION FOR ORDER:**<br>**(1) APPROVING PLAN FUNDING AGREEMENT,**<br>**(2) AUTHORIZING CRO AND RECEIVER TO ENTER INTO AGREEMENTS AND TO SEEK MODIFICATION OF PLAN OF REORGANIZATION, AND**<br>**(3) APPROVING ADMINISTRATIVE EXPENSES,**<br>**AND NOTICE OF HEARING THEREON** |

The Management Committee (the "Management Committee") of Stayton, SW Assisted Living, L.L.C. and each of the Consolidated Sunwest Related Entities ( collectively the

"Debtor"), by and through its counsel, hereby submits this motion (the "Motion") for the entry of an order:

      A.      Approving the Plan Funding Agreement dated March 2, 2010, a copy of which is annexed hereto as Exhibit 1, among AEW Partners VI SW Investments LLC ("AEW"), the Management Committee, the Tenant-in-Common Committee (the "TIC Committee") and the Unsecured Creditors' Committee (the "UCC") and, upon approval, the Debtor (the "PFA");

      B.      Authorizing and directing both the Chief Restructuring Officer Clyde Hamstreet (the "CRO") and the Receiver Michael Grassmueck (the "Receiver") to execute all documents that are necessary to modify the Debtor's Chapter 11 plan of reorganization dated November 29, 2009 and all of the documents contemplated by the PFA to effectuate the terms of the PFA;

      C.      Approving payment to AEW of an expense reimbursement (the "Expense Reimbursement")[1], in an amount to be provided to the court at or prior to the hearing date of the Motion on account of the out-of-pocket expenses incurred by AEW in connection with negotiation and drafting of the PFA and due diligence costs to be paid to AEW in the event: (i) that the Plan Funding Order is not approved by this Court, (ii) the PFA is terminated in accordance with Section 10 of the PFA or (iii) the Management Committee withdraws or abandons the Motion;

      D.      Approving payment to AEW of the Termination Fee in accordance with Section 9 of the PFA; and,

---

[1] As of March 2, 2010 the approximate amount of the Expense Reimbursement is $975,000.

E. For such other relief as may be just and proper.

### The Plan Funding Agreement

1. In the fall of 2009, AEW was approached by members of the Management Committee[2] regarding a possible investment in the Debtor. Since that time, AEW, members of the Management Committee, the TIC Committee and the UCC, Metcap Holdings, LLC, Brentwood Capital Partners and counsel have been engaged in extensive negotiations to formulate a plan to restructure the Debtor's assets and emerge from Chapter 11 as a well capitalized going concern. Those negotiations have resulted in the execution of the PFA. The PFA sets forth the terms and conditions on which AEW and certain of the existing investors in the Debtor will invest between $50 million and $125 million to fund a Chapter 11 plan of reorganization of the Debtor:

   a. Enable the Debtor to emerge from Chapter 11 in a well-capitalized state and to ensure that the Debtor has adequate working capital and funds available to make necessary and appropriate capital improvements;

   b. Provide liquidity for those investors and creditors who would prefer an early cash distribution equal to or better than early cash distributions under the terms of the proposed sale of the Holdco assets to Blackstone, as defined in the Purchase and Sale Agreement dated January 15, 2010.

   c. Provide a vehicle for tenants-in-common investors ("TIC"), LLC Members, and others to continue with their investment and avoid

---

[2] The Management Committee consists of representatives of the TIC Committee and the UCC. Pursuant to this Court's Order dated June 12, 2009, among the Management Committee's duties was to advise the CRO regarding the formulation of a plan for restructuring the Receivership Entities for the equitable distribution of their assets.

MOTION FOR ORDER: (1) APPROVING PLAN FUNDING AGREEMENT;
(2) AUTHORIZING CRO AND RECEIVER TO ENTER INTO AGREEMENTS AND
TO SEEK MODIFICATION OF PLAN OF REORGANIZATION; AND (3) APPROVING
ADMINISTRATIVE EXPENSES; AND NOTICE OF HEARING THEREON - 3

substantial negative tax ramifications that would arise from a sale of the Holdco Properties to Blackstone.

## Summary of PFA Terms

2.  A summary of certain material terms of the PFA is set forth below:

| | |
|---|---|
| New Investment | $50MM to $125MM in the form of a Preferred Equity Investment, of which $50MM to $100MM will be provided by AEW. Existing investors will have the opportunity to purchase up to $25MM of Preferred Equity Interests in addition to AEW's investment. |
| Existing Investors/Common Equity Interests | The plan would allow up to $80 MM (based on $125MM of Preferred Equity Investment) of allowed investor claims (based on the discounted equity value) to be cashed out.<br><br>Existing investors that are not cashed out will receive Common Equity Interests in the reorganized debtor. |
| Preferred Return on New Investment | Preferred Return of 2.25 times investment (increasing by .15 each year after the fifth year up to a maximum Preferred Return of 3.0). |
| Operating Cash Flow Waterfall | Operating cash flow is subject to the following distribution waterfall:<br><br>*First*, to satisfy any loans made by equity investors to the reorganized debtor;<br><br>*Second*, to satisfy the Preferred Return; and<br><br>*Third*, 30% to the holders of the Preferred Equity Interests and 70% to the holders of the Common Equity (rolled over investment from existing investors). |
| Proceeds from Capital Events | Proceeds from capital events is subject to the following distribution waterfall:<br><br>*First*, to satisfy any loans made by equity investors to the reorganized debtor; |

|  |  |
|---|---|
|  | *Second*, to satisfy the Preferred Return; and |
|  | *Third*, to the holders of the Common Equity Interests, until they have received a Common Equity Interest Target ($190MM, less the amount of cashed out investor claims, and subject to certain adjustments); |
|  | *Fourth*, (a) 25% to AEW; (b) 67.5% to the holders of the Common Equity Interests; and (c) 7.5% to the holders of the Preferred Equity Interests (other than AEW). |
| Special Waterfall for Proceed of Sales of Tax Affected Properties | Subject, to certain exceptions, sales of properties during the four-year period following the confirmation of the plan are subject to a special distribution waterfall adopted to address certain tax issues affecting existing investors. |
|  | Existing investors with built-in gain tax issues will be entitled to receive priority tax distributions in an amount equal to 12.5% (for sales made in the first year) or 10% (for sales made in the second, third or fourth year) of their allowed investor claim with respect to the sold property. The total amount of Priority Tax Distributions are capped at the lesser of (a) 10% of the total amount of Allowed Investor Claims that are not cashed out and (b) $55MM. |
|  | The distribution waterfall for these sales are as follows: |
|  | *First*, to satisfy Priority Tax Distributions, |
|  | *Second*, to satisfy the Preferred Return, until the holders of the Preferred Equity Interests have received a 1.65 return on their investment; |
|  | *Third*, (a) 50% to the holders of Preferred Equity Interests and (b) 50% to the holders of Common Equity Interests, until the Preferred Return is satisfied; |
|  | *Fourth*, to the holders of the Common Equity Interests, until they have received the Common Equity Interest Target; and |
|  | *Fifth*, (a) 25% to AEW; (b) 67.5% to the holders of the Common Equity Interests; and (c) 7.5% to the holders of the Preferred Equity Interests (other than AEW). |

| | |
|---|---|
| Governance | The reorganized debtor will be governed by board of managers comprised of the following:<br><br>- Four managers appointed by AEW;<br>- One manager appointed by the existing investors making new cash investment; and<br>- Two managers appointed by the holders of the Common Equity Interests. |
| Drag Along Rights | If the board of managers of the reorganized debtor shall have approved a merger or sale of the company, AEW may require the other members to vote in favor of the merger (to the extent required under applicable law) and agree to sell up to all membership interests held by them pursuant to such sale. |
| Transfers of Membership Interests | Any transfer of membership interests will require AEW's prior written consent which consent may be granted or withheld in its sole discretion; provided, however, that such consent will not be required for transfers to relatives or similar transfers to be agreed upon. |

The Management Committee believes that the PFA provides treatment to the TIC's, unsecured creditors and the Debtor's other investors and creditors that is vastly superior to that provided by the sale of the Holdco Properties to Blackstone.

### **Expense Reimbursement and Termination**

3. AEW has, in good faith, expended substantial sums in conducting its due diligence with respect to the Debtor and its substantial real estate holdings and operations and the negotiation and drafting of the PFA. At the urging of the Management Committee, AEW's due diligence was performed on an accelerated basis so that the Management Committee would have

the ability to provide the TIC's, unsecured creditors and other constituencies with an alternative to the sale of the Holdco Properties to Blackstone.

4. In recognition of the substantial expenses incurred and to be incurred by AEW in connection with the transactions contemplated in the PFA, including due diligence and legal and other professional expenses, the Management Committee agreed to seek court approval for the reimbursement of the such expenses.

5. As contemplated by AEW and the Management Committee, the Debtor will be obligated to reimburse the AEW expenses within ten (10) days: (i) if and after the Court denies approval of the PFA, (ii) after the termination of the PFA for any reason other than the unexcused failure to AEW to pay the Consideration (as defined in the PFA) as more fully set forth in Section 10 of the PFA, or (iii) if the Management Committee withdraws or abandons this Motion. In the event that the PFA is terminated by AEW after the PFA is approved as may be permitted by Section 10, the Debtor will be obligated to pay accrued expenses up to the date of termination.

6. Furthermore, the Management Committee seeks approval of the payment to AEW of the Termination Fee in the amount $4,000,000 as more fully set forth in Section 9 of the PFA. The Termination Fee is an integral part of the transactions contemplated in the PFA. AEW would not have entered into the PFA without the requirement of the payment of the Termination Fee. The Termination Fee is to protect AEW in the event that the Receiver, CRO or any of the Committees breach the PFA by entering into an Alternative Transaction (as defined in the PFA) with another party or parties.

**The Termination and Expense Reimbursement**

7. The Management Committee requests that the Court approve the Termination Fee and Expense Reimbursement. The Management Committee submits that the proposed Termination Fee and Expense Reimbursement are reasonable and necessary to maximize the value of the Debtors' estate. These fees are, moreover, consistent with past practices of bankruptcy courts and are within the range of fees and type of procedures often approved.

8. Payment of topping fees and expense reimbursements similar to the Termination Fee and Expense Reimbursement is a generally accepted practice. See e.g. Calpine Corp. v. O'Brien Envtl. Energy, Inc., 181 F.3d 527, 535-537 (3d Cir. 1999); In re Women First Healthcare, Inc., 332 B.R. 115, 112 (Bankr. D. Del. 2005). Such fees encourage an initial purchaser to invest the time, effort and money necessary to consummate the purchase of a debtor's assets through a plan or otherwise, despite the possibility that such purchaser may not ultimately acquire the property or in this case consummate the PFA because the Committees, the CRO or the Receiver has entered into an Alternative Transaction in violation of the PFA.

9. Courts have evaluated these arrangements under the business judgment rule standard. In re Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); Cottle v. Storer Communictions, Inc., 849 F.2d 570 11th Cir. 1988); CRTF Corp. v. Federated Dep't Stores, 683 F.Supp. 422 (S.D.N.Y. 1988).

10. Under Integrated Resources test, courts have applied certain criteria to assess whether a proposed break-up fee represents a sound exercise of business judgment

including: (a) whether the relationship between the parties who negotiated the breakup fee is tainted by self-dealing or manipulation and (b) whether the amount of the fee is reasonable relative to the proposed purchase price. See Integrated Resources, 147 B.R. at 657. See also In re Financial New Network, 126 B.R. 152 (S.D.N.Y. 1991) and In re 995 Fifth Avenue Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

11. Moreover, courts evaluate a break-up fee in light of the benefit it confers on a debtor's estate, whether it fosters or hinders competitive bidding, is necessary to attract an initial bidder or "stalking horse" and is reasonably proportionate to the contract purchase price. See e.g., In re Bidermann Industries, Inc., 203 B.R. 547 (Bankr. S.D.N.Y. 1997). Courts typically consider a break-up fee appropriate if the bidder helped the estate put the property in a "sales configuration mode" to attract other bidders to the auction. In re Financial News Network, Inc., 126 B.R. 152 (Bankr. S.D.N.Y. 1991).

12. Indeed, approval of termination fees and expense reimbursement similar to those proposed herein have become an established practice in bankruptcy courts nationwide.

13. Additionally, AEW is unwilling to proceed with the transaction without the protection of the Termination Fee and Expense Reimbursement because it is expending substantial time and money in connection with its due diligence of the Debtors' assets and businesses, the negotiation and review of the PFA and all other documents related thereto, as well as other real property and other issues.

14. Finally, the Termination Fee and Expense Reimbursement were negotiated at arm's length in the exercise of the Management Committee's reasonable business judgment.

15. Accordingly, the Management Committee submits that the Termination Fee and Expense Reimbursement are reasonable, necessary and justified in this case, will bring value to the estate and are in the best interest of all constituencies in this case and therefore should be approved.

16. Indeed, the Management Committee believes that the PFA represents the best opportunity for all constituents to optimize their recovery and to protect themselves against the significant tax liabilities resulting from the sale of the Holdco Properties to Blackstone.

Relief Requested

WHEREFORE, the Management Committee requests that this Court enter an order approving the PFA, including reimbursement of the AEW Expenses and the Termination Fee.

DATED this __2nd__ day of March, 2010.

　　　　　　　　　　　　　　　　／s／　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　JOHN S. STEWART, OSB No. 711648
　　　　　　　　　　　　　　　NANCY L. ISSERLIS, *Pro Hac Vice*
　　　　　　　　　　　　　　　Attorneys for the Management Committee